**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**CYNTHIA L. HART,**
        **Plaintiff,**

**v.**                                              **Case No: 5:11cv271/MP/MD**

**MICHAEL J. ASTRUE**
**Commissioner of Social Security,**
        **Defendant.**

_____

**REPORT AND RECOMMENDATION**

        **This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant Hart's application for disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Act.**

        **Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.**

## PROCEDURAL HISTORY

On April 23, 2007, Plaintiff, Cynthia L. Hart ("Ms. Hart"), filed applications for benefits claiming an onset of disability as of April 4, 2007 (tr. 142-153).   The applications were denied initially and on reconsideration, and Ms. Hart requested a hearing before an administrative law judge ("ALJ") (tr. 50-51, 84-98).  A hearing[1] was held on June 30, 2009 at which Ms. Hart was represented by counsel and testified (tr. 52-79).  A vocational expert also testified.  *Id*.  On December 30, 2009, the ALJ entered an unfavorable decision (tr. 7-24).  On January 14, 2010, Ms. Hart requested review by the Appeals Council (tr. 5-6) and submitted as additional evidence a letter from her attorney dated April 25, 2011 (tr. 211-225).  The Appeals Council declined review on June 3, 2011 (tr. 1-4).   The Commissioner has therefore made a final decision, and the matter is subject to review by this court.  *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007); *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This timely appeal followed (doc. 1).


## FINDINGS OF THE ALJ

Relative to the issues raised on this appeal, the ALJ found that Ms. Hart met the insured status requirements of the Act through December 31, 2010; that she had not engaged in substantial gainful activity since her claimed onset date; that she had severe impairments of post status gunshot wound, degenerative disc disease, and obesity, but that she did not have an impairment or combination of impairments that met or equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; that she had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except that she is precluded from climbing ladders, ropes, or scaffolds, and from work at heights or around moving machines; that she was capable of performing past relevant work as a sales clerk,

---

[1]There are documents in the record referencing another hearing on January 14, 2010, but no transcript or other documents evidencing that it transpired are attached (tr. 25-49).

printer shop helper, administrative assistant, receptionist, and brazier; and that she has not been under a disability as defined in the Act from claimed onset date through the date of the ALJ's decision (tr. 12-20).

### STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid. *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002). Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. *Ingram*, 496 F.3d at 1260.

The court must also determine whether the ALJ's decision is supported by substantial evidence. *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)). Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed. *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400. Substantial evidence is more than a scintilla but less than a preponderance, and encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion. *Moore*, 405 F.3d at 1211 (citation omitted). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Moore*, 405 F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233,

1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  Findings of fact of the Commissioner that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The social security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits.  *See Moore,* 405 F.3d at 1211; 20 C.F.R. § 416.920 (2009) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2009) (five-step determination for DIB).  A finding of disability or no disability at any step renders further evaluation unnecessary.  *See* 20 C.F.R. § 416.920; 20 C.F.R. § 404.1520.  The steps are:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe physical or mental impairment that meets the duration requirement?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 to subpart P of 20 C.F.R. Part 404 and meet the duration requirement?

4.      Considering the individual's residual functional capacity, can the individual perform past relevant work?

5.      Can the individual perform other work given the individual's residual functional capacity, age, education and work experience?

*Id*.

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore*, 405 F.3d at 1211 (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir.1985)).  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987).  If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner.  *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

Ms. Hart was treated at Brain and Spine Center, P.A., from January 30, 1989 to October 29, 2007 (tr. 266-352).  Her initial diagnosis was seizure disorder, but it was controlled well with medication.  *Id*.  In 1993 she returned due to increasing headaches, and on December 28, 1993, an EEG was performed, which was read as abnormal due to asymmetric and asynchronous background activity consistent with a possible structural lesion.  *Id*.  On December 30, 1993, a CT brain scan without contrast showed mild atrophic changes and encephalomalacia related to her past gunshot wound trauma[2].  *Id*.  Ms. Hart was seizure free in 1994, and on February 8, 1995, she had another EEG done to determine if she was having epileptogenic activity; results were normal.  *Id*.  Ms. Hart complained of insomnia and headaches at her October 23, 1995 visit.  *Id*.  Her next visit was on April 24, 1997, and complaints of headaches persisted.  *Id*.

She returned on February 25, 2004 with complaints of severe headaches.  *Id*. She advised not having any seizures since her last visit, and was sent for a CT scan

---

[2]In the late 1980's Ms. Hart was shot several times in her chest, arm and head (tr. 234-243).

of the head without contrast[3] and an EEG.  *Id*.  The February 26, 2004 EEG was abnormal due to a breach effect causing slowing over the right frontal central and mid temporal head regions, most likely related to skull alterations and structural changes.  *Id*.  On October 23, 2006, Ms. Hart complained of insomnia, headaches and pain, numbness and tingling sensation in her right hand.  *Id*.  She advised that the headaches occurred in clusters, predominantly at night, and would come for several months and then go away.  *Id*.  Her mental status was normal.  *Id*.  She was given medication for the headaches and insomnia, and sent for a sleep study and a nerve conduction study/EMG of her right arm in order to evaluate for carpal tunnel syndrome.  *Id*.  Her November 2, 2006 sleep study showed no evidence of sleep apnea, hypopnea syndrome, or periodic limb movement disorder.  *Id*.

On November 8, 2006, Ms. Hart advised that the medication for insomnia was successful, and that she had not had any headaches since her last visit.  *Id*.  Her mental status evaluation was normal.  *Id*.  The November 13, 2006 NCV/EMG study of her right arm read as abnormal showing electrophysiologic evidence for a predominantly C5-C6 radiculopathy on the right.  *Id*.  She then visited her doctor on the same day, who discussed her results, diagnosed cervical radiculopathy, and sent her for a CT scan of the cervical spine to assess for cervical disc disease.  *Id*.  Her mental status was normal.  *Id*.  The November 28, 2006 CT scan of her cervical spine was normal.  *Id*.

Ms. Hart returned on December 4, 2006 and advised she no longer had headaches, her sleep had improved significantly with the medication, but pain in her right upper extremity was worse.  *Id*.  Her mental status was normal.  *Id*.  Her doctor prescribed medication and physical therapy.  *Id*.  On January 17, 2007, Ms. Hart stated the medications and physical therapy were helping her with the cluster headaches and neck pain so she was released to her primary care physician.  *Id*.

---

[3]**Results are not on the record.**

She returned for prescription refills and complaints of dizziness on March 16, 2007. *Id*.

Ms. Hart's first treatment at the Brain and Spine Center, LLC after the claimed onset date was on April 12, 2007 when she had a nerve conduction study of her right upper extremity, which was read as normal. *Id*. An EMG done on April 26, 2007 showed C6-C7, C7-T1 radiculopathy, which meant she had a pinched nerve coming from C8 to T1. *Id*. At that visit, Ms. Hart complained of a lot of pain radiating in the middle part of her spine and down to her right arm. *Id*. Her mental status was normal. *Id*. She was referred for a CT scan of her thoracic spine, right shoulder and brachial plexus and was prescribed medication. *Id*.

CT scans were done the next day. The cervical spine showed the subtle possibility of some mild narrowing of the foramina at C6-C7. *Id*. The brachial plexus was normal. *Id*. The thoracic spine CT scan showed a metallic bullet in the right posterior musculature at the T2 level with chronic deformity of the posterior portion of the right second rib. *Id*. The right shoulder CT scan was essentially negative. *Id*. Ms. Hart visited her doctor on May 3, 2007 to discuss the results of the CT scans. The doctors felt that the symptoms were consistent with cervical and lumbar radiculopathy. *Id*. She was referred for MRI's of the brain, cervical and lumbar spine in order to compare the radicular nature of the pain versus a pain syndrome resulting from the central nervous system (thalamic pain syndrome). *Id*. She was also prescribed medication. *Id*. Her mental status was noted as normal. *Id*.

MRI's were done on May 4, 2007. *Id*. The lumbar MRI showed minor arthropathy on the left at the L5-S1 level associated with mild effacement of the infraforaminal fat without absolute findings of spinal or foraminal stenosis. *Id*. The brain MRI showed a preexisting lead gunshot wound with extensive encephalomalacic changes and volume loss in the right hemisphere. *Id*. The cervical MRI showed lower cervical spondylosis with central and left paracentral

disc bulge at the C6-C7 level and a smaller central disc bulge at the C5-C6 level, but no lateralizing signs, cord impingement or spinal stenosis.  *Id*.

Ms. Hart returned to her doctor on May 8, 2007 with complaints of chronic pain in her neck, low back, and radiating to her right upper extremity, which was becoming worse and constant in nature.  *Id*.  Her mental status was normal.  *Id*.  She was diagnosed with thalamic pain syndrome, cervical and lumbar radiculopathy, and was prescribed medications.  *Id*.  Ms. Hart went on June 8, 2007 to request an alternative to the medications, and was referred for cervical epidural injections at C6-C7.  *Id*.  Her mental status was normal.  *Id*.  On her July 25, 2007 visit, Ms. Hart reported that the injections helped a little but not much.  *Id*.  Her mental status was normal.  *Id*.  On her last visit of October 29, 2007 Ms. Hart complained of right arm pain, but advised that Vocational Rehabilitation would be retraining her.  *Id*.  Her mental status was normal.  *Id*.

On November 26, 2007, Karin S. Maddox, M.D., from the Brain and Spine Center, LLC wrote a letter stating that Ms. Hart suffered from thalamic pain syndrome and chronic pain radiating from her neck, shoulder area and thoracic area down her right arm (tr. 376, 443, 455).  Dr. Maddox felt that Ms. Hart was unable to function and had continuous throbbing headaches, that her cognitive function was limited, and that due to those conditions she supported Ms. Hart's disability and felt that she was unable to work.  *Id*.  Dr. Maddox explained that the thalamic pain syndrome's medication caused Ms. Hart to be sedated making it difficult for her to work.  *Id*.  On February 4, 2008, Dr. Maddox sent Ms. Hart a letter releasing her from her care (tr. 456).

Ms. Hart was treated at the Eye Center of North Florida, P.A. from February 27, 2006 to March 28, 2007 (tr. 226-233).  During her first visit she complained of pressure in her right eye, inability to read, chronic cough, nausea/vomiting/diarrhea, and migraines.  *Id*.  She was treated with medication and bifocals for the diagnosis of glaucoma.  *Id*.

On May 20, 2007, Ms. Hart filled out a form for the agency and described her pain as pins sticking her going down her spine, arms and legs making it hard for her to walk (tr. 187-191).  Her right arm would go numb, and sometimes she could not move her neck toward the right.  *Id*.  The pain medication (Lyrica) sometimes made the pain subside temporarily.  *Id*.  She went to therapy twice a week for a month.  *Id*. As to her daily activities, she admitted being able to cook, handle her personal care, clean her house albeit with pain afterwards, do laundry, shop with a buggy, sleep with help of Loritab medication, drive in the daytime, and do child care.  *Id*.  She was unable to walk a lot, bend, reach, go up and down stairs, and carry a lot.  *Id*.

On August 14, 2007, Owen D. Oksanen, M.D., performed a consultative evaluation (tr. 234-239).  Ms. Hart advised that she had stopped working due to arm and back pain.  *Id*.  Dr. Oksanen noted her past medical history of multiple gunshot wounds to her right hand, chest, and frontal area of the brain that occurred in 1987, but was not privy to the medical records concerning those injuries.  *Id*.  He also mentioned her glaucoma and hypothyroidism.  *Id*.  Ms. Hart told him that in October of 2006 she started having pain in her right wrist with numbing of her fingers, and was ultimately diagnosed with cervical spine nerve compression.  *Id*.  In April of 2007, she began having pain in her mid-back with shooting pain down her legs to her heels.  *Id*.  She alleged that the pain prevented her from continuing her secretarial work.  *Id*.

On the physical examination, Dr. Oksanen found that Ms. Hart had mild discomfort with rotation of her neck to the right and with flexion/extension.  *Id*.  She had 4 to 5 out of 5 grip strength bilaterally in her upper extremities with normal fine manipulatory movements.  *Id*.  Her full shoulder and elbow/wrist range of motion had subjective only right wrist discomfort.  *Id*.  Her lower extremities had full joint range of motion and her motor function appeared intact.  *Id*.  She had erect posture and a normal gait.  *Id*.  She had subjective mid-back discomfort with any palpation.  *Id*.  Her

heel/toe and tandem walking was unremarkable, and she moved around "okay."  *Id*. She had moderate limitation to the thoracolumbar spine range of motion.  *Id*.

Dr. Oksanen concluded that Ms. Hart had diffuse right wrist, mid-back, and bilateral lower leg pain subjectively, and vague, withdrawn personality pattern consistent with gun shot wounds to the frontal lobes.  *Id*. He felt that neurologically she may have something akin to a reflex sympathetic dystrophy and/or cognitive dysfunction due to the gunshots, and suggested psychological testing for the latter. *Id*.  He strongly suggested reviewing neurology records "because while vague here, the history suggests that there is possibly something going on."  *Id*.

On September 21, 2007, George L. Horvat, Ph.D., performed a psychological consultative evaluation of Ms. Hart (tr. 240-243).   Ms. Hart reported no mental problems, but did complain of glaucoma, pinched nerve in cervical spine that affects the right side of her body.  *Id*.  She told him about the gunshot incident in 1986 where she was injured in her chest, arm and head (still has fragments). *Id*.  She lived alone, showered, read, cooked, walked a couple of times a week, and went to church and movies.  *Id*.  She had great appetite, but lacked energy and spontaneously cried. *Id*.  She denied hallucinations or suicidal thoughts.  *Id*.

Dr. Horvat found Ms. Hart alert, well-groomed, and with normal posture and gait.  She was easily distractible.  Anxiety interfered with her concentration, and she had limited memory.  *Id*.  She was oriented with normal eye contact, but her facial expression, mood and affect were depressed.  *Id*.  She was cooperative, her speech flow was normal, and her thought content was appropriate.  *Id*.  Dr. Horvat determined that her intelligence level and fund of knowledge were average, and her abstraction, judgment, and decision-making were normal.  *Id*.  He concluded that her illness was her main stressor, and that she had deficient coping skills.  *Id*.  Ms. Hart told him she thought she was impaired, but just her right hand.  *Id*.

Dr. Horvat diagnosed Ms. Hart with Major Depressive Episode and Post-traumatic Stress Disorder ("PTSD").  *Id*.  His prognosis was that there were no

psychological reasons why she could not return to work because her psychological treatment could be scheduled around her work commitments. *Id*.

On October 12, 2007, Shirley Ellis, Ph.D., conducted a psychiatric review technique, and determined that Ms. Hart's impairments were not severe and that she suffered from affective and anxiety-related disorders (tr. 244-257).   Dr. Ellis concurred with Dr. Horvat that Ms. Hart had a Major Depressive Episode and PTSD. *Id*.  As to functional limitations, Dr. Ellis determined that Ms. Hart had no restrictions of activities of daily living, no difficulties in maintaining social functioning, and no episodes of decompensation, but had mild difficulties in maintaining concentration, persistence or pace. *Id*.

On January 17, 2008, Dr. John A. Dawson provided a physical residual capacity assessment of Ms. Hart to the agency (tr. 353-360). He stated that she could occasionally lift 20 pounds; frequently lift 10 pounds; stand and walk for a total of 6 hours in an 8-hour workday; and push or pull unlimitedly.  *Id*.  Dr. Dawson determined that Ms. Hart could frequently climb ramp/stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladder/rope/scaffolds. *Id*.  The assessment lists no manipulative or visual limitations with the only environmental limitation as needing to avoid hazards even to moderate exposure. *Id*.  Dr. Dawson concluded that Ms. Hart's symptoms were attributable to a medically determinable impairment, and the severity or duration were not disproportionate to the expected severity or duration. *Id*.  He reasoned that the severity of her symptoms was consistent with the medical and non-medical evidence, and he assigned her full credibility. *Id*.

On January 18, 2008, James L. Meyers, Psy.D., conducted a psychiatric review technique of Ms. Hart for the agency (tr. 361-374).  He concluded that she did not have a severe impairment, but had a coexisting non-mental impairment that required a referral to another medical specialty.  *Id*.  Dr. Meyers found that she had an affective disorder (Major Depressive Episode) and an anxiety-related disorder (PTSD). *Id*.  He noted that she had a mild degree of restriction as to activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in

maintaining concentration, persistence or pace, but no episodes of decompensation. *Id*.

Ms. Hart was hospitalized at the Life Management Center of Northwest Florida, Inc.'s Crisis Stabilization Unit from January 21, 2008 to January 30, 2008 due to hygiene and violent behavior (tr. 377-382, 447-451).  At admissions her orientation was "not to date," her mood was flighty, she had a flat affect, poor memory, insight and judgment, and wandering loose associations.  *Id*.  Ms. Hart stated that her major source of stress was that her home was being foreclosed.  *Id*.  She was diagnosed with psychosis secondary to gunshot wound to head with cerebral atrophy.  *Id*.  She was treated with various medications until her discharge.  *Id*.

Ms. Hart was treated by Daniel Bieda, DO from March 17, 2008 to April 29, 2008 (tr. 395-419).  On her first visit she complained of chronic sharp pain in her mid back. *Id*.  She stated that in her free time she enjoyed dancing, reading and creating cards on the computer.  *Id*.  Her mental status was oriented to time, place and person.  *Id*. Dr. Bieda diagnosed seizure disorder, backache NOS and hypothyroidism, and he prescribed medication.  *Id*.  Ms. Hart returned on March 26, 2008 with complaints of cramping on her right side.  *Id*.  Her mental status was oriented to time, place and person, and as to her mood and affect with no depression, anxiety or agitation.  *Id*. Dr. Bieda referred her to a neurologist.  *Id*.

On April 11, 2008, Ms. Hart advised that she had no pain and just needed medication refills.  *Id*.  On her last visit she also denied any pain.  *Id*.  Her mental status was oriented to time, place and person with no depression, anxiety or agitation.  *Id*.  Dr. Bieda prescribed her thyroid medication.  *Id*.

Dr. Bieda referred Ms. Hart to Henry Comiter, M.D., who saw her on May 7, 2008 and November 12, 2008 (tr. 383-392).  On her first visit Dr. Comiter diagnosed her with convulsions/seizure disorder and prescribed medication.  *Id*.  He gave her the same diagnosis on her last visit.  *Id*.

**Ms. Hart was treated at Riverside County Regional Medical Center from May 5, 2009 to July 10, 2009 (tr. 422-440). On May 5, 2009, she complained of pain and swelling of her left hand because she slipped and fell at home. *Id.* She returned on May 16, 2009 for a prescription refill. *Id.* Her mental status was normal. *Id.* On May 26, 2009, she complained of insomnia. *Id.* She was referred to an ophthalmologist for treatment of her glaucoma. *Id.* On June 22, 2009, she complained of lower back pain and insomnia. *Id.***

**On June 17, 2009, James M. Halderson, LPN, wrote a letter regarding Ms. Hart's medical conditions and past treatment (tr. 421). On June 25, 2009, Ms. Hart's attorney provided the agency with a summary of her recent medical treatment and list of her recent employment, which included jobs for most of 2009 (tr. 216-220).**

## DISCUSSION

**Ms. Hart contends that the ALJ's granting diminished or no weight to the diagnostic and functionality opinions of treating neurologist Maddox was harmful legal error, the ALJ's finding that her mental impairments impose no functional restrictions was based on an improper assessment of the treating and consultative source evidence, and the ALJ's finding that her testimony was not credible was legally erroneous and lacked substantial evidentiary support (doc. 10, pp. 10- 18). The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained (doc. 15). The issue thus presented is whether the ALJ's decision that Ms. Hart was not disabled, in light of her physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.**

1.   <u>ALJ's Granting Great Consideration but not Controlling Weight to Dr. Maddox's November 26, 2007 Letter</u>

Ms. Hart alleges that the ALJ granted diminished or no weight to Dr. Maddox's opinion dated November 26, 2007 (doc. 10, pp. 10-13); however, the ALJ stated that he gave it "[g]reat consideration but not controlling weight" (tr. 18).   The ALJ explained that the narrative by Dr. Maddox "was not well-supported by objective findings and [was] not consistent with the other evidence of record."  *Id*.  The ALJ noted Ms. Hart's denial of chronic pain and any mental limitations to several physicians after Dr. Maddox's November 26, 2007 letter.   This constitutes good cause under *Phillips v. Barnhart*, 357 F.3d 1232 (11th Cir. 2004).

In *Phillips*, the 11th Circuit held that "[t]he opinion of a treating physician. . . 'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'"   *Phillips*, 357 F.3d 1240-41 quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997).  The Court then defined "good cause" as

> when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id*.  When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons. *Id*.

A thorough review of the records detailed above supports the ALJ's finding. Several medical records before and after Dr. Maddox's letter mention frequently that Ms. Hart : (1) was not in pain (tr. 395-419), (2) had normal mental status (tr. 266-352, 395-419, 422-440), (3) had at most minor difficulties with her activities of daily living (tr. 187-191, 240-243), and (4) even enjoyed dancing, reading and making cards on her computer (tr. 395-419).  The ALJ's assessment is supported with substantial competent evidence as required, and as such his decision is not subject to reversal.

### 2.    ALJ's Mental Impairment Finding

Ms. Hart challenges the ALJ's determination that her mood disorder does not cause more than minimal limitation and is non-severe (doc. 10, pp. 13-15).   In step 3 of his assessment, the ALJ thoroughly analyzed Ms. Hart's mental impairment (tr. 14-15).  The medical records support the ALJ's conclusion.  The vast majority of the medical providers noted that Ms. Hart's mental status was normal, especially the ones who treated her after the hospitalization episode (tr. 395-419, 422-440).  Despite that isolated episode, which was treated successfully with medication (tr. 377-382, 447-451), she did not exhibit symptoms to support a severe impairment as alleged. Dr. Horvat concluded that there was no reason why Ms. Hart could not return to work (tr. 240-243).   All of the psychological/psychiatric medical providers concurred in their diagnosis of Ms. Hart's mental status, and that at most she suffered from minor limitations due to her affective disorder and PTSD (tr. 240-243, 244-257, 361-374). Thus, since the medical records support the ALJ's conclusion that Ms. Hart suffered only from a mild mental impairment, Ms. Hart's argument is without merit.

### 3.    ALJ's Credibility Finding

Ms. Hart argues that the ALJ's credibility determination is unsupported by substantial evidence (doc. 10, pp. 15-18).   The ALJ noted that shortly after the claimed onset date Ms. Hart lived alone, prepared her own meals, and did her own housework (tr. 19).  The ALJ found that these activities of daily living, in addition to her moving from Florida to California and back, suggested that her daily activities were not as limited, at least at times, as reported.  *Id*.  The ALJ explained that he considered all of the medical documentation, and reasoned that Ms. Hart's complaints of a disabling level of pain were not reasonably supported by the objective medical evidence, especially given the idiosyncratic nature of the pain.  *Id*. The ALJ adequately explained whey he found her complaints to be less than credible.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED** and that the clerk be directed to close the file.

At Pensacola, Florida this 19th day of June, 2012.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).**